Good morning, Your Honors. Janet Tong, Federal Defenders of San Diego, on behalf of Mr. De Leon-Godinez. I'm going to try to just keep my eye on the clock and save a minute. All right. I'd like to address the Skokieville interrogation. Mr. David Bowman's criminal rights were violated in this case, and he was sentenced to 15 months in Skokieville, San Diego. I would direct Your Honors' attention to this court's recent case, United States v. Craig, that this case controls here. And under that case, Mr. De Leon was in custody when he was interrogated because his home had been converted into a police-dominated area. Now, at the time of this question, by the court proclamation, there were seven armed court proclamations inside this very small, very small apartment. Did any of them actually display their weapons as opposed to – I believe that Mr. De Leon testified that he saw a weapon when he brushed his jacket or something. But nobody brandished a weapon. Nobody unholstered a weapon. That's correct, Your Honor. And that is one point of distinction between this case and Craighead. However, that does not control the inquiry here because there were so many agents in Mr. De Leon's apartment, and they controlled the circumstances under which he was subjected to interrogation. Now, what happened with – what happened was Mr. De Leon was asleep in his apartment at 6 in the morning when agents started pounding at his door. And when he opened – when he opened the door, agents – and after the agents came inside the apartment, they took over the situation. There were – there were initially five agents, and then there were two more agents that came in for a total of seven. And they actually asked the residents of the apartment, which there was Mr. De Leon and three others, to come out of the apartment while they subjected the entire premises to a dog-suit search. So they brought out a dog and stabbed him in his full eight-quarter incisions. And it's – you know, it's unquestionable in those circumstances that a reasonable person would feel that his home had been taken over by the police and converted into this police-dominated house. And the counsel held the first rule to the question. Assuming that he was in custody in the sense that he wouldn't feel free to leave, why would it not be harmless error because of the other evidence that he was an alien and that he entered without authority? Yes, Your Honor, Judge Gould. The – the government has to meet a burden here, assuming that the – and it is our position that his murder rights were violated. The government has to show that the evidence that was admitted to trial of the statements was harmless beyond a reasonable doubt and did not contribute to the jury's verdict. And they can't here because the statements that came in in violation of Mr. De Leon's murder rights were direct confessions to two contested elements of the offense here. His alienage and whether he had permission to be present in the United States. There's no question about his alienage. I mean, that was well established by the information that was in the A file, right? Your Honor, the information that's in the – that was in the A file was – was taken at a proceeding that was not a criminal proceeding. The determination at an immigration proceeding does not suffice to prove a criminal proceeding beyond a reasonable doubt that he was, in fact, an alien. But – An admission at a prior – at a prior proceeding where he's been deported is not sufficient? Your Honor, there were very different circumstances. I can see why it would be persuasive evidence. I don't disagree with you there. But there were very different circumstances. Didn't they actually have evidence in the A file? Didn't they actually play a tape in which he said, I'm from Guatemala? That – that's true. It is. But that was in 1995. But if – but if – has his citizenship changed? Is there any evidence his citizenship had changed? Your Honor, the point of my name is not that there was some sort of citizenship change. But you've argued on the basis of Arizona v. Fulminante that a confession is like no other. And if he's – if they got him on tape confessing that he was from Guatemala in a 1995 proceeding, why isn't – why isn't that pretty determinative information? And it certainly corroborates – certainly not inconsistent with what they heard from the – from the evidence that you would now like suppressed. But there are two pieces of evidence. And the first is that, as Your Honor pointed out, it is possible for alienation to change. And in the world of defense perspective, at a criminal trial, the defense doesn't bear the burden of proving that somebody actually is from Guatemala. It has to be suspected that he's from Guatemala. And the span of over 10 years from 1995 until trial, it is possible that his citizenship – his citizenship status didn't change. But if that were true, any competent defense attorney would have put that evidence in, regardless of whether he had a burden or not. If that were actually the fact, it would have come out at trial. He had been deported. He had – he had a – a possession charge. He had a murder charge. They – the chances of him having been – obtained U.S. citizenship in the meantime were pretty slim, weren't they? And everybody knew that. That's – I'm not going to claim – that was a likely fact. The second point that Your Honor – Your Honor should state that he was deported. And the other point about that old 1995 proceeding is that there are different kinds of things that motivate somebody in an immigration proceeding. Often people are in detention. It is not uncommon for people in detention to state that they're a citizen of, for example, Mexico in order to be released from detention and immediately deported. I've seen this. This is the case for people that are actually citizens. This kind of case does come back to our office, in fact, where somebody has admitted the citizenship of a different country in an immigration proceeding and it was later proved otherwise. Right. And in this case, he lied about that. He said he was from Mexico and he actually was from Guatemala. Being a Mexican citizenship would have likely got him sent back to Mexico where he would rather be rather than being sent back to Guatemala. Well, Your Honor, that's true. And that's for the reason why that kind of admission is unreliable. Now, in terms of the evidence, the case is considered as an illegal presence here. Those are very troubling because the government's evidence of his presence in this case or his permission to be in any case in this case was all in the negative. It was all circumstantial evidence that they had gone through, did the files, and they had found a lack of evidence. Now, when he said he was from Mexico. But that kind of evidence has been countenance in numerous cases, hasn't it? Absolutely, Your Honor. When it comes to as a matter of sufficiency of evidence, I don't contend that it was insufficient evidence to sustain a conviction. I think it was. But it's not good enough. Do you have a case that supports your argument in that regard, that the lack of a record in the INS is not sufficient to establish harmless error? Your Honor, I think the closest case on harmless error is the San Juan Cruz case. Now, in the San Juan Cruz case, it was very similar to the San Juan Cruz case. In that case, the defendant was found under much more suspicious circumstances. The defendant was actually found in an irrigation ditch just north of the United States-Mexico border. So what part of that case talks about the harmless error point that you're making? Your Honor, that case finds that there was not harmless error. This case is based on the fact that the statements were admitted. And one very important point, I think, is to look at how powerful that evidence was. In this case, the total count of statements are evidence by conclusion. In the case of the consent to be in the United States, there was no permanent evidence at all, other than what Mr. DeLayno said. What he told you is what should have been. Was there any a-file evidence in the San Juan Cruz case? Your Honor, the San Juan Cruz case does not say in any of the cases whether that was the case. But I also looked at the fact that the prosecutor here understood that this is very powerful evidence. And that's why he argued that it was. Counsel took over the question. So did the appellant ever give any testimony or his lawyer any argument to the fact that he was not an alien or that he had permission? No, Your Honor. There was no affirmative fact presented by the defense in this case at trial. And that's not – I mean, it's not the defense's burden. It's not necessary that the defense present such evidence. It was also the case, I believe, in the San Juan Cruz case that there was no affirmative evidence presented. Yet the court found in that case, which I think is the most similar case to this one, that there was not harmless evidence. The other point I'd like to make is that the prosecutor here – No, Your Honor. My understanding is this. You're making a distinction between saying it's sufficient evidence, but it's not enough to show harmless beyond a reasonable doubt. But if it's sufficient and it's uncontested, that is, if there's no contrary evidence, then why doesn't it show that it's harmless beyond a reasonable doubt? Because, Your Honor, the harmless beyond a reasonable doubt error standard recognizes that the constitutional violations that occur And the way it recognizes that is that it asks the question, sets the standard, that whether or not the evidence contributed to the jury's burden. And I'm paraphrasing from the United States v. Williams case. So the question is actually somewhat different. It's not whether this court would find him guilty. It's not whether the jury did find him guilty, but it's whether that constitutional error contributed to the trial, which I think it unquestionably did. And the prosecutor argued his statements, Mr. Dick Williams' statements. He mentioned it four times in closing arguments. This was not just a supplemental piece of evidence. This was very, very powerful evidence. It's basically admissions to the event from the horse's mouth itself. Now, Your Honor, I would like to save some time unless there are any other questions. Any questions? It appears not. All right, counsel. Good morning, Your Honors. If I may, Your Honor. The court finds that the defendant, Mr. Williams, may have pleased the court more greatly before the United States. Your Honor, we're right when we're in the issue in the States. The district court did not error in finding that the defendant was not in custody at the time he gave the statements. Now, obviously, the court did not decide that at the time before the state was ruled, but it's the government's position that there is enough evidence to find, even if this court holds the proceedings below that standard. There's still a lot of unwritten care. And we have advanced arguments and briefs that decide... Can I go? Yes. So, I read your briefs, sir. But, you know, how can it really be said that with all those policemen there, that he would have felt free to get up and leave? Your Honor, if we look at fatality to circumstances, one of the most important points that distinguishes this case from Craighead is that he consented to those officers' entry. He consented not only to the officers' entry, but also to the search that was then conducted. And I don't think that can be emphasized enough. In Craighead, the eight officers from three separate agencies came in under current law with the search warrant. And so they let, from the get-go, they let that defendant know, there's no question, whether you let us here or not, we're going to be here. But in this case, when it was litigated below, although the defense contested the consent below, they did not challenge that appeal. And so I think that's one important factor, because if you look at a police-dominated atmosphere, yes, we admitted right away in the first sentence under that factor, we understand that seven officers being there is a factor that could take place But if this court keeps in mind that they didn't come in under a warrant, I believe in the reply brief, the defendant used the word that this house was their apartment, it was under siege, I think that's an entirely inaccurate description. Seven officers in a small apartment is a lot of officers. They bring in an eighth officer with a dog. And I've got to say that the people sitting in the apartment when you've got seven officers, who they can determine are armed and suppose are armed, even though the arms haven't been brandished, is going to be very, very intimidating. Who's going to think that they're free to leave? We're going to go out and get breakfast? We'll come back when you guys are done? What were they supposed to do? Well, Your Honor, I think it also, I'm glad you brought up the point, he wasn't alone here. And currently the defendant was alone in his house, and then they took him into a back storage room, and they closed the door, and an officer had his back to the door. Here there were four people total in that apartment. But they weren't people who had any kind of authority or power to, you know, change the situation at all. They were fellow residents of the apartment. So how would that change the equation? Because I think if you look at it, one of the factors against totality of the circumstances, this defendant's in there, he sees his other three roommates all being subjected to the same treatment. And another thing I want to point out, when these officers came here, they were looking for a person named Jessica. That's also important. So they're looking for somebody that's not the defendant. They asked for permission to come in. They don't come barging in. And then once they're in... Now, the problem I'm having with this part of your argument is really imagining that a person in appellant's shoes could feel like they could say, okay, while you're looking for Jessica, I'm going out to Denny's. Or I'm going for a stroll. I mean, if that's the reality of it, explain to me, just in common sense words, why that is. Because I'm having trouble visualizing that. I hope you get to the harmless air analysis in case we decide that he was in custody. I absolutely intend to argue that. But, Your Honor, I think any case where the custody is not found, you can always say that somebody would have been intimidated by police. If you're going to say that simply seven officers being present is the end of the story, then that's a per se rule, and it's no longer protected. It's a lot of officers. It took seven of them to work in a two-bedroom apartment? Well, there's four people, though. Well, what do the four people have to do with this if they're not Jessica? Well, the officers also testified, yeah, they were asking for Jessica, but the reason that so many weren't was because they had information that there were more that could be aliens. That was the testimony, criminal aliens. Okay, we could have, I mean, this is a lot of officers in a very, very small place, and they're looking for something, not these people. And so we asked, what would a reasonable defendant think? Here come officers, they're not looking for me. They're not all ganged up on me. We could have told them they could step outside and they were just going to look for just a minute. We might have just sent two officers in, left some others outside the door. There's a number of things that might have been done, but bringing seven officers in and taking a four-person apartment into an 11-person apartment and then a 12-person apartment plus a big dog, it does sound like it's police-dominated when the police outnumber the occupants two to one. And yet the dog came in at the consent of the occupants. They consented to a search, so that was the fact that it's different from Craighead. But the other thing I'd point out, except the record page 34, I would go back to the very beginning of the encounter then, Your Honor, and that's something that wasn't present in Craighead. Counsel, what was the point of bringing in the dog if they were looking for Jessica? The record indicates that they brought her in just to do a sweep to look for narcotics. There was no other testimony on that. And outside of the record, I have no other information. But, again, I would say the district court found... Why would they be entitled to bring the dog in to look for narcotics? I don't know, Your Honor, except that there was consent. In the Supreme Court, going back to the Memmingham, the Schneckoff cases in the mid-1970s, said, you know what, once somebody consents, all these questions about what might have been I don't think are then any longer in control. But that's still, we still look at the totality of the circumstances and how the police, you know, ramped up the ante, so to speak. Exactly. And so I say, how did they ramp it up? If you have 11 or 7 officers in there, if they're all standing around the defendant, yeah, I'd give you that that was ramping up. But when the record shows that one officer spoke to the defendant while the other officers were engaged with the other people, that defendant's going to think, you know what, I'm not being singled out for special treatment. They didn't come here looking for me. They came here looking for somebody else, and now they're going to talk to everybody about that person. I mean, look, Your Honor, I understand. It may not be the easiest case for me here. Craighead was decided after the district court's ruling. But we have a good-faith argument, and we advance that. But I think now I'd like to turn to harmless error, as Judge Gould indicated. Now, this case, there are, as I was reviewing again, it occurred to me, there was just one other admission by the defendant. In June of 1995, as was previously indicated, this defendant stated at an immigration hearing that he was a citizen. And the defense counsel would have you believe, although, as Judge Rattleson pointed out, any competent attorney would have put this evidence in if it were true, that somehow in that intervening time, low and poor manhood status was conferred on him. But one of the other exhibits is Government Exhibit 6. And it's at Supplemental F6 of Record, pages 147 and 148. This evidence was argued by the prosecutor. This is very important. Page 148, this defendant, on the back of his notice, in his notice of intent to issue a final administrative order, checked boxes and signed his name and even had a witness. He says, I have read the allegations before in the notes of intent. I admit that I am dependent. And on the first page, the first allegation, which is now on page 147 of the Supplemental F6. Oh. It's at Excerpts of Record. Let me catch up with you, Dan. Yeah. I was looking at the Excerpts of Record. Okay. I'm there. All right. At the top is the allegations. It says, one, you are not a citizen or national of the United States. And then it says, two, you are a native of Mexico and a citizen of Mexico. Now, if you flip the page to 148, there's two sections. One says, I wish to contest. It's blank. The next one says, I do not wish to contest. That one is checked, and it's signed by the defendant, and it has a witness. That's yet one more admission by this defendant of his alienation, and it's from 2001. Counsel, what's your response to opposing counsel's argument that if this admission was not powerful evidence, you would not, or someone from the government would not have referred to it four times in closing? What's your response to that? I'm glad you asked, Your Honor. There's no question that the prosecutor referred to it. At that time, we had litigated this evidence, or he had, and it's all in front of him. Now, I'd say really look at this record and give it scrutiny. Excerpt of Record from the defendant starts at page 255. It's the closing argument. And the prosecutor is going through the evidence of the elements. And the first one he talks about is alienage. And I think it speaks volumes that the first thing he mentions aren't the disputed statements here, but that June 1995 tape-recorded admission, which, as Judge Biden pointed out, was played for the jury. The jury heard the defendant, in his own words, admit that he was a citizen of Mexico. Now, at the bottom of Excerpt of Record 255, the prosecutor says not only did he admit it in 1995, he also admitted it now. And the defenseman may say the prosecutor referred to this four times. I believe there were 14 total pages or 13 total pages of transcript comprising the closing argument. If it came every three pages, it might be one thing. All four of those references are in the one paragraph that the prosecutor devoted, and that goes to Excerpt of Record 256. And then after that, he never mentions that again. He never mentions the disputed statements in rebuttal. And, in fact, he goes on at page 250 of Excerpt of Record 256 through 258 to discuss all the other evidence of alienage, which included the multiple documents in the A files, which Biden pointed out later. Not only were aliens show cause for 1995, not only an executed war over New York in 1995, but also the notice of intent to issue the administrative order in 2001, as well as the executed war over New York in 2001. So under these totality of circumstances, this disputed statement was just one piece of evidence. And the defendant, you know, refers to it, the defense counsel refers to it as a confession. Now, yes, it's an admission of an error of an element, but it's not the confession of the entire crime or other elements. And on this record, it's more accurately described as an admission as opposed to a confession. I would agree with that, Your Honor. And on this record, then, when you only have the one mention of that in the one paragraph, followed by no other mention of it, I say would support a finding harmless error. Now, another point I wanted to make. The defense relies heavily on a case called the United States v. San Juan Cruz. Now, in San Juan Cruz, it is a little unclear what exactly was in the record. But this, I think, is very important. In this court, and also keep in mind, the government did not argue harmless error in that case. The court reached it to a sponte. But what the appealant says is, other than the disputed statements in San Juan Cruz, all the other evidence was circumstantial. Now, here, I don't think you can describe circumstantial the defendant's admission in June 1995 of his alienage, which was played before the jury and was unacoustical, or the statement that I just explained to you in supplemental excerpts of the record, pages 147 and 148. These are two direct admissions. So what you have in this case are three admissions by the defendant, one of which is the suspect one. So you've got two left from his own mouth and his own hand. That's powerful. And then you've got all this other voluminous documentary evidence. So I think on that record, the government has that burden of proving harmlessness. You know, when you look now, in one final court, and I'm glad you obeyed this, also, you made this point, this court in Casitas, L.A., decided in our briefs on that case, decided for a Supreme Court case called United States v. Needham, said, sure, as long as the government's burdened, but we still look to see if the defendant, in fact, can testify. And, in fact, the board of state's defense law assembly, which Judge Bridey also sat on that panel, also looked at that. And in that case, they found harmlessness there, in large part because the defendant testified, and he gave plausible explanation of events which, if believed, could have greatly met the government's evidence. Here, as Judge Moore alluded to, there was no evidence put on why the defense contested. So, in fact, all the evidence that I refer to earlier, plus the fact that the defendant never raised a finger, that harm is there. And for the defense to say that somehow speculation can lead to an opposite conclusion, I would say is a conclusion that should not be countenanced by this court, so to speak. It looks like unless this court has any questions on the obsessive responsibility of the other issues, the court would assume. Any questions? It appears not. Thank you, counsel. Rebuttal. Thank you, Your Honor. I think it's evident that the real part of this case is the harmless error analysis. I would just like to make one quick point about that. I think what has come out, certainly through the government's argument, is that there was more evidence on the alienation problem. There were these other conditions on the alienation problem. But there was very little evidence other than this certification of non-existence on the consent to apply for reentry. And I think that's the problem that really makes a big difference here. And that's, I think Mr. Akin brought up the difference between circumstantial and direct evidence. And there is only circumstantial evidence of his lack of consent to be President of the    And that's why it's so important to examine the evidence, the evidence that there was no record and the testimony, the evidence that there was no appropriate document. Right. But that's pretty standard proof, as Judge Rollins pointed out. That's pretty standard in these cases. Because what else can the United States say? We've examined our records. We can't find any evidence of evidence. It's proving a negative, and it's the best the United States can do. It is, Your Honor. And that's what makes Mr. de León's statements that much more powerful in this case, is that they were charged with proving a negative. But in this case, they had positive. They had his affirmative statement saying, I didn't have information here. They have a statement over the course of ten years or more in various proceedings admitting time and time and time again that he was not lawfully in the United States. So, Your Honor, that's as to alienate, because permission to apply for reentry, that's different every time. I mean, that's something that changes that is possible to change along the timeline, and it's much more likely. So, I mean, I think, Your Honor, I think that it just really doesn't make a difference that what the judge said. Mr. de León testified here. Was he asked whether he had permission at the trial? I'm sorry? Was he at Mr. — when Mr. de León testified, did he ask — was he asked whether he had permission to enter the United States? Your Honor, correct me if I'm wrong, but I believe he did not testify at trial. He testified at the motion hearing. Only at the motion hearing? I believe that's correct. I — there was no — there was definitely no — there was definitely no affirmative statement. Okay. And the only point — the only final point I would make is there's a big difference between the full and the paper documentation, which is strongly subjected to a reasonable downshot from the defense perspective, and a real-life statement where, from the jury's perspective, they hear that he has said, I don't have permission to be present. The jury is not really going to be talking that much more into the other evidence he presented. I mean, that's there. That's the final words. The defendant said it himself. And unless there are any other questions, Your Honor, let's see. Thank you. It appears there are none. Thank you, Your Honor. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Gould, Rawlinson, Bybee